# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 14, 2014 Session

## STATE OF TENNESSEE v. JOSEPH LEON KNOWLES

**Appeal from the Circuit Court for Giles County**
**No. 15583      Stella Hargove, Judge**

---

**No. M2013-01653-CCA-R3-CD - Filed April 23, 2014**

---

The Defendant, Joseph Leon Knowles, pleaded guilty pursuant to a plea agreement to attempt to commit aggravated child abuse of a child under six years old, a Class B felony, with the sentence to be determined by the trial court. *See* T.C.A. § 39-15-402 (2010). The trial court sentenced the Defendant as a Range I, standard offender to twelve years' confinement. On appeal, the Defendant contends that the trial court erred during sentencing by failing to apply certain mitigating factors relative to remorse, assisting the police, and his not having a substantial intent to violate the law and by denying him alternative sentencing. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

John S. Colley, III (on appeal), Columbia, Tennessee, and Daniel Freemon (at the guilty plea and sentencing hearings), Lawrenceburg, Tennessee, for the appellant, Joseph Leon Knowles.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Bradshaw, Assistant Attorney General; Michael T. Bottoms, District Attorney General; and Beverly White, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

This case relates to injuries sustained by the Defendant's then-girlfriend's twenty-month-old daughter. According to the State's recitation of the facts at the guilty plea hearing,

> Mr. Knowles was the boyfriend of the victim's mother. . . . He was babysitting
> . . . the child. Through his statement and the investigation that they found, he
> was taking care of the child.
>
> The child . . . was crying. He . . . first told the Officers that she . . . had
> slipped and fallen, and then he . . . said that he . . . slapped her . . . and she hit
> the floor with her head. She would go in and out of consciousness. They did
> take her to Hillside Hospital, where they took her to Vanderbilt.
>
> [The] Vanderbilt . . . eyecam [showed] . . . retinal bleeding. They found
> other bruises on the child . . . in her ears [and] . . . on her face.
>
> And in his statement to Investigator Shane Hunter, he had admitted
> slapping her up – basically, slapping her upside the head in which – and
> around the ears. And that he had grabbed her around her mouth and turned her
> head to him to get her attention in the past.

The Defendant told the court that he was sorry for his actions, that he "didn't mean to," and that he had "no intention to hurt the child."

At the sentencing hearing, the presentence report was received as an exhibit. The report showed that the Defendant had no previous convictions. It showed that the Defendant provided a written statement, which stated,

> I moved in with [the victim's mother] about two months before the incident.
> Her daughter, [A.H.] resided with us. [A.H.] was a very active and normal
> child. My two year old son also resided with us on the day this happened[.
> A.H.] seemed very upset and crying a lot from the time she woke up that
> morning. I could not get her to calm down. I tried to comfort her and tried
> using more appropriate discipline but she continued to cry and act out. Finally,
> I lost control of myself and struck her with the back of my hand in anger. This
> caused her to fall backwards on the tile floor striking her head. When I saw
> that [A.H.] was injured I immediately called 911.

As a result of my actions[,] I have lost custody of my son. Not a day goes by that I don't reflect on and regret my actions which caused these injuries to [A.H.]

The presentence report included a narrative, which stated,

Mr. Knowles contacted E-911 on October 8, 2011, advising that the small child . . . was unconscious and non-responsive. EMS arrived on the scene and air lifted the child to Vanderbilt Hospital. EMS Supervisor Dustin Blade advised Deputy Gulley that the child had multiple bruises throughout her body. I was contacted of the situation and responded to Vanderbilt Hospital. I was advised while en-route to Vanderbilt by [a] social worker stating that they requested my assistance. I was advised . . . that the child had signs of ongoing child abuse. The child had bleeding in both retina[]s, subdural hematoma, bruising throughout her body including both ears, . . . forehead, both sides of her cheeks, thighs, arms, and legs. Vanderbilt diagnosed the child as being a victim of ongoing child abuse. . . . Mr. Knowles admitted to having hit the child in the head. Mr. Knowles stated that the child was crying and he was attempting to feed the child[. H]e went to back hand her and the child by this account had gotten too close and slipped on the floor. Mr. Knowles stated that the child was 'knocked unconscious.' Mr. Knowles called his girlfriend who advised him to contact 911. Mr. Knowles admitted that he had an anger issue and this was not the first time as to hitting the child. Mr. Knowles was questioned about the bruising about her face. Mr. Knowles admitted to grabbing the child about the mouth area and squeezing her face. Mr. Knowles was questioned about the bruising inside of the child's ears. Mr. Knowles stated that he had hit the child in the past by back handing her about the ears. Mr. Knowles repeatedly stated that he was not a 'child abuser'; he was attempting to discipline the child. [The child] is twenty months old.

The presentence report showed that the Defendant had a high school education and had a gas, metal, and arc welding certification. The Defendant reported having good physical and mental health and denied having substance abuse problems. The Defendant had a four-year-old son, paid child support monthly, and paid back child support due to his time in confinement before being released on bond in this case and due to a work-related injury. He was employed as a welder and lived with and received financial support from his parents.

The victim's mother submitted a victim impact statement to the trial court. She said the victim was terrified of men and had nightmares for months in which she appeared to relive the incident. She said the victim had aggression issues and would require counseling

when she was old enough to talk about the incident. The victim's maternal grandmother submitted a victim impact statement in which she discussed her dissatisfaction with the criminal justice system and her fear that the Defendant would receive a lenient sentence. She discussed the victim's fear of men and the impact of that fear on the victim's relationship with her grandfather. The victim's maternal aunt submitted a victim impact statement in which she discussed how she learned of the victim's injuries and her fear of whether the victim would survive. She requested the Defendant pay restitution because the victim would probably have "memory, muscle, emotional, and/or bone and joint problems" as a result of her injuries. The victim's maternal grandfather submitted a victim impact statement in which he discussed learning of the victim's injuries and his fear she would not survive. He said it took a couple of weeks after the victim's release from the hospital for her to trust him again. He discussed his dissatisfaction with the criminal justice system and the State's permitting the Defendant to plead guilty to a Class B felony rather than a Class A felony. Each family member requested the maximum sentence.

Expert medical testimony from a previous hearing was received as an exhibit. At the previous hearing, Dr. Curtis Wushensky, a neuroradiologist, testified that he interpreted the victim's MRI. He found a subdural hematoma between the victim's skull and brain, which centered around the back of the brain. He concluded that the back of the victim's brain had a contusion. He said that the injury was located on the cortex of the parietal lobes and that he found a small amount of blood between the lobes. He concluded that some form of trauma caused the injury.

Dr. Wushensky testified that the victim's injuries were about seven to ten days old when he reviewed the test results, although he did not recall when the MRI was performed or when he interpreted the results. He did not observe any life-threatening injuries, broken bones, or fractured bones. He did not know if the victim lost consciousness or suffered extreme pain. He denied the victim's injuries might cause disfigurement. He thought, though, that the victim's having some permanent deficit was a "probable outcome," although he was unaware of any permanent deficit at the time of his testimony. He stated that usually a brain injury consistent with the victim's injury caused scarring that resulted in a permanent injury. He said that the victim's injury was near the primary visual center and that he believed her eyesight would be affected. He said it was possible the trauma impacted the front of the victim's head but injured the back of her skull. He concluded that the trauma came from the front or the back of the victim's head.

On cross-examination, Dr. Wushensky testified that the victim's injury could have been accidental, which he explained might include falling six to eight feet onto a concrete floor. He said, though, the injury was not caused by the victim's running and falling down. He said the brain injury could have been caused by a punch to the head or by being pushed

against a wall. He did not think the victim would have died had the brain injuries gone untreated. He said some of the symptoms associated with the victim's brain injury included confusion, headaches, vision difficulty, and balance difficulty. He said it could take years for the symptoms to appear.

Dr. Megan Strother, a neuroradiologist, testified that she interpreted the victim's head CT scan and that the scan showed subdural hematomas below the skull at the top of the brain. She said the subdural hematomas were caused by the tearing of bridging veins between the brain and skull. She said these veins might tear because the brain moved and the skull remained still or because the brain moved at a different speed than the skull. She said she always considered motor vehicle accidents and child abuse as potential causes of this type of injury.

Dr. Strother testified that she could not determine the amount of time that elapsed between the injury and the CT scan. She did not think the victim's head injury was life-threatening. She did not know if the victim suffered pain and did not observe any broken or fractured bones. She could not offer an opinion regarding whether the victim's injury would result in disfigurement, loss of a bodily function, memory loss, or loss of mental faculties. On cross-examination, Dr. Strother testified that she only interpreted scans and x-rays and did not treat patients.

Dr. Richard Hwang, an ophthalmologist, testified that he examined the victim after non-accidental trauma was suspected and that he found retinal hemorrhages in both of her eyes. He said the victim's right eye had more hemorrhages than her left eye. He said he was uncomfortable determining the cause of the hemorrhages because he was in training at that time and would defer to Dr. Joos, the attending physician. He said the possible causes for retinal hemorrhages included trauma and diseases that made patients prone to bleeding.

Dr. Karen Joos, an ophthalmologist, testified that she examined the victim's eyes and concluded that retinal hemorrhages were present in each eye and that the right eye contained more hemorrhages than the left eye. She did not observe swelling of the optic nerve, which indicated a lack of cranial pressure. She said the left eye contained eight hemorrhages centering around the optic nerve. Regarding the right eye, she counted fifteen hemorrhages and said she saw small, pinpoint and large, circular hemorrhages.

Dr. Joos testified that in young children, hemorrhages in both eyes were associated with abusive head trauma. She said the hemorrhages could also be caused by crush injuries from a motor vehicle accident. She concluded that the hemorrhages in the victim's eyes were caused by abusive head trauma. She said the abuse occurred within one week of her examination. She said the hemorrhages were not life-threatening and were not associated

with a loss of consciousness, pain, permanent disfigurement, or permanent vision loss. She said hemorrhages usually disappeared within a couple of weeks.

On cross-examination, Dr. Joos testified that retinal hemorrhages resulting from abusive behavior were caused by rapid acceleration and deceleration, which caused the blood vessels in the eye to break. She agreed the hemorrhages were signs of head trauma. She denied the hemorrhages might result from a clumsy child walking and falling. On redirect examination, she agreed the victim's hemorrhages might be caused by one trauma or "one blow."

Dr. Laurie Lawrence, board certified in internal medicine, pediatrics, and pediatric emergency medicine, testified that she treated the victim in the emergency room when the offense occurred. She said that when the victim arrived by air ambulance service, she was quiet and lethargic and had bruises on her forehead. She did not know the age of the bruises. She said the victim was conscious and opened her eyes when addressed by name. The victim's heart and lungs were normal, but she complained of pain when pressure was applied to her stomach. The victim also had swelling in her left eye and had bruises on her left ear, hands, buttocks, and thighs. She said some of the bruises were green and yellow, which indicated they were older. She concluded that the victim suffered multiple traumas based on the head injury and varying ages of the bruises. She denied the victim had broken or fractured bones.

On cross-examination, Dr. Lawrence testified that the victim's injuries could cause long-term neurologic disabilities, including a lower IQ, difficulty reading, and difficulty performing intellectual skills. Based on the MRI and CT scans, she diagnosed the victim with bi-frontal subdural hematomas, bleeding around the brain, and widespread bruising on the body.

On redirect examination, Dr. Lawrence testified that she did not know if the victim suffered injuries that would result in long-term neurologic disabilities. On recross-examination, she stated that the widespread bruising was not caused by falling from a highchair. She said a fall-related injury usually damaged one side of the head, not both sides.

Carrie Donnell, a pediatric nurse practitioner, testified that she participated in the Vanderbilt Hospital child abuse consult service and that she was contacted by Dr. Lawrence regarding the victim. She interviewed the Defendant and the victim's mother, obtained medical and family histories, discussed the victim's condition with the treating and consulting physicians, and concluded with the director of the consult service that the victim suffered child abuse. She said the child abuse diagnosis was based on the head trauma, the retinal hemorrhages, and the multiple, widespread bruises that could not be explained by the

victim's medical and family histories. She noted the victim had a tear inside her mouth between the gum and the teeth.

Ms. Donnell testified that the head injury alone might have been inflicted accidentally but that the head injury with the other injuries were signs of abusive head trauma. She said that all the victim's injuries were consistent with child abuse and that she had never seen these injuries explained by any other cause. She said that direct or indirect trauma to the lip caused the tear and that trauma caused the bruises to the ear. She said the ear bruises might have been caused accidentally but only when a patient had a specific medical history "match[ing] that injury." She said ear bruising was "highly indicative of abusive injury." On cross-examination, Ms. Donnell stated that she was unable to date the bruises but that some of them were older based on the coloration. She agreed she could not date the bruises to the victim's ears.

At the sentencing hearing, Probation Officer Lindsay Hill testified that she prepared the presentence report and that the Defendant cooperated during her investigation. She was able to confirm all the information the Defendant provided except if his employer would continue his employment if he were placed on probation. She agreed the Defendant did not have any previous convictions.

Dr. Mildred Chen testified that she was the victim's primary care pediatrician since the victim's birth on January 20, 2010, and that she last saw the victim at her three-year-old well-child visit on May 6, 2013. She said the victim was a healthy child with normal growth and development. She treated the victim on November 20, 2012, for an eye infection and said the victim was otherwise healthy. The victim was seen on January 24, 2012, for her two-year-old well-child visit. She said the victim was healthy and growing normally. She denied observing any conditions that indicated the victim had confusion, headaches, defused vision, or a loss of balance. She agreed that after the present incident, the victim was treated at the emergency room for hitting her head on a coffee table.

On cross-examination, Dr. Chen testified that at a well-child visit, a child's heart rate, respiration, temperature, weight, height, and head circumference were determined. She said x-rays and laboratory work were not performed unless a reason existed for them. She denied performing x-rays or scans on the victim since the incident but said she performed external eye examinations using a flashlight to determine the victim's "light reflex." She said she treated the victim two days after the victim hit her head on a coffee table and did not see signs of a concussion at that time. She said a concussion could last up to one week. She diagnosed the victim with a forehead contusion. She did not perform an eye exam to determine if the victim needed glasses. She said the victim was treated by an ophthalmologist.

On redirect examination, Dr. Chen testified that if she had seen a need to perform x-rays or scans on the victim, she had the ability to order those tests. She saw no need for those tests or the need for an eye exam during the victim's well-child visits in May 2013 and January 2012. She said that after the incident in the present case, she first saw the victim on October 17, 2011, and that the victim had a normal condition. She agreed any trauma suffered by the victim had lingering effects. Dr. Chen reviewed the medical records related to the victim's hitting her head on a coffee table and agreed the records showed that the victim was diagnosed with a forehead contusion and a concussion without loss of consciousness.

Giles County Sheriff's Investigator Shane Hunter testified that he interviewed the Defendant within twenty-four hours of the victim's being taken to the hospital. He read the Defendant his *Miranda* rights. He said the Defendant denied any wrongdoing initially but admitted "he had abused the child." He said the Defendant consented to the police entering his home.

On cross-examination, Investigator Shane Hunter testified that the interview was recorded and that it was admitted as evidence at a previous hearing. On redirect examination, he stated that it was not uncommon for a suspect to deny wrongdoing in a child abuse case but ultimately admit his or her involvement.

The transcript of the Defendant's recorded police interview was received as an exhibit. The Defendant said he and the victim's mother had been in a relationship for eight or nine months and had lived together for three months. He said his son and the victim lived with them. The Defendant said he put the victim in her highchair but did not "put the thing on the front of it." He said, though, the victim usually did not move. He said that he told the victim, "don't move, baby," and that he walked away to use the restroom. He said that he heard a loud thud, that he ran to the victim, that the victim was lying on the floor, that he picked her up, and that she was limp. He called the victim's mother and then 9-1-1. He said he unsuccessfully attempted to wake the victim with a cold rag.

The Defendant stated that he found the victim on her back. He described the chair as wooden with a booster seat and said the victim was not buckled in the seat. He thought the victim fell about one and one-half to two feet. He denied that the victim was conscious when he found her and that his son was present when the victim fell. He said he worked from 3:00 to 11:00 p.m. the night before the offense, went to a neighbor's house when he arrived home, walked home, and went to bed. He said the victim's mother left for work early the next morning. He said he woke at 10:30 a.m. and woke the victim about five minutes later. When asked about the victim's bruises, he said the victim fell off the porch when she was in her mother's care.

Regarding child discipline, he said he and the victim's mother attempted to put the children in timeout or send them to their rooms. He said sometimes they "might spank them on the butt a little bit or just pop them. You know, smack them on the hand a little bit and . . . tell them, 'No.'" When Investigator Hunter told the Defendant that the medical staff at Vanderbilt Hospital believed the victim had been abused and that her injuries were inconsistent with a fall from a highchair, the Defendant said he had no reason to hit her.

The Defendant agreed he and the victim's mother were having financial difficulty and were tired from working long hours. He agreed that "things happen . . . especially with little kids," that children test parents' patience, and that "sometimes things get out of control." The Defendant repeated that he had no reason to "abuse the child." He said that although he had grabbed the victim's face, he had no reason to hit her. He said that when he grabbed her face, he turned her face toward him to clean it and might have squeezed too hard. He denied knowing how the victim's ears were bruised. The Defendant admitted having anger problems but denied his anger could cause him to hit a child.

When questioned further about the truthfulness of his statement, the Defendant admitted he had hit the victim but said he did not intend to hurt her. He expressed concern that he would lose custody of his son. He said he was hit across the face as a child and admitted he wanted "some kind of help" for his anger problems. He said that when he became angry, he attempted to walk away to calm down. He admitted again that he had slapped and hit the victim but denied he "really physically hurt the kid." He denied causing the victim's head injuries and said the victim's falling from the highchair caused those injuries. He continued to claim the victim fell from her highchair when he was in the bathroom. He said the bruises on the victim's ears might have been caused two days previously when he "swatted" the victim. He said that he did not want to go to jail and that he did not think he belonged in jail.

Regarding the victim's injuries, the Defendant stated that he "whooped" the victim on her bottom "a little bit" and slapped her on the side of her head but that he did not mean to hurt her. He said the victim "got a little out of hand." He said he hit the victim on her cheek "to turn her head and stuff." He said that the victim became fussy, that he gave her a bottle, and that the victim "slid" out of the highchair onto the floor. He said that he was backhanded and swatted as a child and that it was "just a cycle thing." He said things got out of hand. He said, though, that he did not want to incriminate himself because he did not want to lose his job and family. He said that he usually did not hit a child, that it was a spur-of-the-moment thing, and that it was "just in swinging distance." He agreed he slapped the victim with his hand and said he was closer to the victim than he thought. He said the bruises to her arms and legs were caused by the victim's playing with his son. He said the bruises

on the victim's forehead were caused by her falling off the steps one week previously. The Defendant gave the investigator permission to enter his home.

At the sentencing hearing, Gene Kelly testified that he had known the Defendant for three or four years and that he was a family friend. He said he baptized the Defendant on September 11, 2011. He said he thought the Defendant could benefit from a second chance because he had learned from his mistakes. He did not believe the Defendant was a danger to the community. On cross-examination, he stated that he and the Defendant had not discussed the facts of the case. When asked if he was surprised about the extent of the victim's injuries, he said he was not there when the incident occurred.

The Defendant apologized for hurting the victim and said he took responsibility for his actions. He told the court he wanted to continue working and supporting his son. He said he was willing to take classes or obtain any type of help the court ordered.

The trial court considered the evidence at the sentencing hearing, the principles of sentencing, the presentence report, the arguments of counsel, the nature and characteristics of the offense, the evidence regarding enhancement and mitigating factors, the statistical information from the Administrative Office of the Courts regarding sentencing practices for similar offenses in Tennessee, and the Defendant's statement to the court. The court found that the Defendant had no previous convictions and had maintained employment since high school.

The trial court found that the expert medical testimony showed the victim suffered severe trauma as a result of the Defendant's conduct. It found that the Defendant "denies or, certainly, downplays his involvement, to the extent that he is taking responsibility" for the twenty-month-old victim's injuries. The court noted the nurse practitioner's testimony that the victim had bruises on multiple locations of her body, a tear to the inside of her mouth, a subdural hemorrhage, a retinal hemorrhage, a brain injury, and abusive head trauma that was never associated with an accident. The court found that the victim suffered severe child abuse, that the victim was not just backhanded, and that the Defendant used violent force. The court noted that the Defendant's main concerns were going to jail and losing his handgun carry permit.

The trial court found that the victim's future medical condition was unknown. The court found that Dr. Wushenshy concluded that the "probable outcome" was permanent deficit of function in some way and that some permanent injury was common with injuries like those suffered by the victim because the injury was close to the primary visual center of the brain. The court noted that only time would determine the extent of the victim's injuries.

Regarding the Defendant's potential for rehabilitation, the trial court stated that it was concerned whether the Defendant would commit another act of child abuse. It noted that the Defendant claimed he was under stress and had anger problems but that he also was concerned about going to jail and losing his handgun permit. The court found that the Defendant's request for anger management classes was insincere. Regarding whether probation would depreciate the seriousness of the offense and whether confinement was necessary to deter others from committing similar offenses, the court found that the Defendant did not appreciate the seriousness of his conduct and that the Defendant refused to admit the extent of his conduct. The court found that the Defendant was "far from telling" what he did to the victim.

Regarding mitigation, the trial court refused to find that the Defendant showed genuine remorse for his conduct and discredited the Defendant's statement of remorse. The court found that although the Defendant provided a police statement, it did not believe the Defendant. The court refused to find that the offense was committed without a sustained intent to violate the law because the evidence showed previous abuse and because the Defendant admitted previously abusing the victim. *See* T.C.A. § 40-35-113(11) ("The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct."). The court found that the Defendant had no previous criminal convictions and no previous substantial conflicts with the law.

The court found that enhancement factor (4) applied because the twenty-month-old victim was unable to summon help. *See* T.C.A. § 40-35-114(4) (2010) ("A victim of the offense was particularly vulnerable because of age or physical or mental disability."). The court placed "great weight" on factor (4). The court found that enhancement factor (6) applied because of the extent of the victim's brain injuries. *See id.* § 40-35-114(6) ("The personal injuries inflicted upon . . . the victim was particularly great."). The court found that enhancement factor (10) applied because the proof showed that the Defendant had no hesitation about committing a crime when the risk to human life was high. *See id.* § 40-35-114(10). The court placed "great weight" on factor (10) and noted the medical expert testimony regarding the probability of long-term damage due the extent of the brain injury. The trial court found that enhancement factor (14) applied because the Defendant was living with the victim and her mother at the time of the offense and because the Defendant was entrusted to care for the victim when the injuries were inflicted. The court stated factor (14) was serious and important for the court to consider. *See id.* § 40-35-114(14) ("The defendant abused a position of . . . private trust . . . that significantly facilitated the commission or the fulfillment of the offense."). The court did not apply mitigating factors and sentenced the Defendant to twelve years' confinement as a Range I, standard offender. This appeal followed.

The Defendant claims that the trial court erroneously failed to apply mitigating factor (11) and to consider his remorse and his cooperating with the police in determining his sentence. *See* T.C.A. § 40-35-113. The State argues the trial court did not abuse its discretion.

The length of a sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; *see State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986).

Generally challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. *Bise*, 380 S.W.3d at 706. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Id.*

Regarding manner of service, our supreme court has applied the abuse of discretion standard with a presumption of reasonableness to "questions related to probation or any other alternative sentences." *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012). Under the Criminal Sentencing Reform Act's 2005 revisions, a defendant is eligible for probation if the sentence imposed is ten years or less. *See* T.C.A. § 40-35-303(a) (2010); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008). A defendant has "the burden of establishing suitability for probation." T.C.A. § 40-35-303(b); *see Carter*, 254 S.W.3d at 347. In order for a defendant to meet this burden, he or she must show that "probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *Carter*, 254 S.W.3d at 347 (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)).

Regarding mitigation factor (11), the Defendant claims that he did not have a sustained intent to violate the law and that the trial court erroneously found that his conduct was not a "one-time thing." The record reflects that Dr. Laurie Lawrence testified that the victim arrived at the emergency room with widespread bruising on her ears, hands, buttocks, and thighs. Although she could not determine the ages of the bruises, the green and yellow coloration of some showed that they were inflicted before the incident related to the present offense. Dr. Lawrence concluded that the victim suffered multiple traumas based on the head injury and varying ages of the bruises and that the widespread bruising was not caused by falling from a highchair. Nurse Practitioner Carrie Donnell was also unable to date the bruises but said some of them were older based on the coloration. During his police interview, the Defendant said the bruises on the victim's ears might have been caused two days previously when he "swatted" the victim. We note the expert medical testimony that showed bruises on the ears are indicative of child abuse. He also admitted that the incident related to the present charge was "just a cycle thing." We conclude that the trial court did not abuse its discretion.

Regarding the Defendant's remorse and cooperating with the police, the record reflects that the trial court considered whether the Defendant was remorseful for his conduct but discredited the Defendant's claims of remorse. Likewise, the trial court considered his providing a statement to the police but found the Defendant was not being truthful regarding his conduct. The Defendant expressed more concern during his police interview of losing custody of his son, losing his job, and avoiding jail and less concern about the victim's well-being and his abusive conduct. Although the Defendant addressed the court at the sentencing hearing and claimed responsibility for his conduct, his statement focused on his desire to continue working and supporting his son and his willingness to take anger management classes as the court saw fit. We cannot conclude that the court abused its discretion by refusing to consider the Defendant's remorse and his cooperation with the police as mitigation.

The Defendant also claims that the trial court erroneously applied enhancement factors (6) and (10). *See* T.C.A. § 40-35-114(6), (10). Regarding factor (6), the Defendant claims that serious bodily injury was an element of aggravated child abuse and that the victim did not suffer injuries beyond those establishing the elements of the offense. The State concedes that the trial court erroneously applied factor (6). We agree that the trial court erroneously applied this factor. Our supreme court has concluded that an enhancement factor may not be applied when the factor is an element of the offense. *State v. Imfield*, 70 S.W.3d 698, 706-07 (Tenn. 2002); *see State v. Dean*, 76 S.W.3d 352, 381 (Tenn. Crim. App. 2001) (stating that factor (6) may be applied when the victim "'sustained appreciable personal injuries beyond those incidental to the crime'") (quoting *State v. Carico*, 968 S.W.2d 280, 286 (Tenn. 1998)). Although the evidence shows that the victim suffered serious bodily injury, the

evidence fails to show that the victim suffered injuries beyond that necessary to establish the offense.

Regarding enhancement factor (10), the Defendant argues this factor may only be applied when a defendant endangers the lives of people other than the victim. The State concedes that the trial court misapplied this factor. We agree that the trial court erroneously applied this factor. This court has concluded that factor (10) should not be applied when the defendant's conduct puts only the victim at risk. *State v. Kelley*, 34 S.W.3d 471, 480 (Tenn. Crim. App. 2000); *see State v. Ruane*, 912 S.W.2d 766, 784 (Tenn. Crim. App. 1995).

Our inquiry, though, does not end with the trial court's misapplication of two enhancement factors. The Defendant's sentence is not invalid "[s]o long as there are other reasons consistent with the purposes and principle of sentencing[.]" *Bise*, 380 S.W.3d at 706. Regarding the nature of the offense, the trial court found that the victim had bruises on multiple locations of her body, a tear to the inside of her mouth, a subdural hemorrhage, a retinal hemorrhage, a brain injury, and abusive head trauma that was never associated with an accident. The court found that the victim suffered severe child abuse, that the victim was not just backhanded, and that the Defendant used violent force. Regarding the potential for rehabilitation, the court was concerned that the Defendant would commit future acts of child abuse because he failed to appreciate the seriousness of his conduct and because he refused to admit the full extent of his actions. The court also expressed the need to prevent depreciating the seriousness of the offense and to deter others from committing similar offenses. Moreover, the court properly applied enhancement factors (4) and (14). *See* T.C.A. § 40-35-114. The court placed great weight on factor (4) because the victim was less than two years old and was unable to summon help. Regarding the abuse of private trust, the court said factor (14) was serious and important for it to consider in determining the length of the sentence. We conclude that although the trial court improperly applied two enhancement factors, the record shows that the twelve-year sentence "is otherwise in compliance with the purposes and principles" of our Sentencing Act. *See Bise*, 380 S.W.3d at 709-10.

The Defendant also claims that the trial court erred by relying on deterrence and depreciating the seriousness of the offense in denying him alternative sentencing. The State argues the court did not abuse its discretion. We conclude that the Defendant is not entitled to relief.

The record reflects that the trial court found that probation was not appropriate based on the need to prevent depreciating the seriousness of the offense and to deter others from committing similar offenses. The court found that the Defendant failed to appreciate the seriousness of his conduct because he refused to provide a complete account of what

occurred. The Defendant's downplaying his conduct and being concerned mostly with losing his son, family, and job supports the court's conclusion that the Defendant failed to appreciate the seriousness of his conduct. The expert medical testimony shows the severe injuries inflicted upon the victim and the unknown status of the long-term impact on her neurological development and eyesight. Likewise, we note that because the Defendant's sentence was twelve years, he was ineligible for probation. *See* T.C.A. § 40-35-303(a); *Carter*, 254 S.W.3d at 347. We cannot conclude that the trial court abused its discretion.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE